## LORD v. BROOKS & A.

A, owning 40 shares in the P. Bank, executed, in 1839, a trust deed conveying said shares to B, in .trust to "pay the dividends of the said stock as the same may from time to time be made and declared" to A; and after A's death to " transfer and convey the same " to the heirs of C. Said deed contained a recital that A contemplated marriage ; that she was desirous " of receiving the income or dividends on said shares to her sole and separate use, notwithstanding the said contemplated marriage, for and during her natural life, and that after her decease the said 40 shares should be distributed and conveyed to and among " the heirs of C. The charter of the P. Bank expired in 1845. From 1845 to 1849 the P. Bank made various cash dividends of surplus. These dividends, together with $4,000 received as the par value of the 40 shares, were invested by B in the purchase of 53 shares of the P. E. Bank. The P. E. Bank ceased to do business in 1864. From 1864 to 1868 the P. E. Bank made various cash dividends of surplus, which, together with the par value of the 53 shares, were received by B. From the funds so received, B invested $4,000 in the purchase of 40 shares in the F. N. Bank, paid $1,000 to A, and had left in his hands a balance of $3,063.15. A died in 1869. The value of the 40 shares in the P. Bank, at the date of the trust deed, was less than the value of the 40 shares in the F. N. Bank at the time of A's death.

*Held*, that A's administrator could recover the balance of $3,063.15 in B's hands, as income to which A was entitled under the trust deed.

IN EQUITY. Samuel Lord against Charles W. Brooks, administrator, and others. Samuel Lord, the complainant, asks for the direction of the court in the discharge of his duties as trustee. The defendants are Charles W. Brooks, administrator with the will annexed of Charlotte A. H. Brooks, and the heirs-at-law of Augustus Lord. The administrator having filed an answer, the plaintiff put in a general replication, and evidence was offered by both the plaintiff and the administrator. No answer was filed by the heirs of Augustus Lord, but counsel appeared for them and furnished a brief.

The following facts appeared :

July 22, 1839, Mrs. Charlotte A. H. Lord, the widow of Augustus Lord, was the owner of 40 shares in the Piscataqua Bank, derived from her late husband. Upon that date, she, together with Samuel Lord and Charles Brooks, entered into a written contract under seal. This contract recited Mrs. Lord's ownership of the shares, and the source of her title; also, that a marriage between Mrs. Lord and Mr. Brooks was in contemplation ; and that Mrs. Lord was desirous " of receiving the income or dividends on said shares to her sole and separate use,

notwithstanding the said contemplated marriage, for and during her natural life, and that after her decease the said 40 shares should be distributed and conveyed to and among the heirs-at-law of the said Augustus Lord, according to the laws of distribution of the State of New Hampshire." By said contract, Mrs. Lord (with the assent of Mr. Brooks), in consideration of one dollar, and of the covenants of the trustee, assigned said shares to Samuel Lord, in trust to " pay the dividends of the said stock as the same may from time [to time] be made and declared, after the deduction of the tax imposed on the same to the said Charlotte;" and after her death, to " transfer and convey the same to and among the heirs-at-law of the said Augustus Lord, according to the statute of distributions of the State of New Hampshire."

On July 23, 1839, a certificate of ownership of said 40 shares was issued by the bank to Samuel Lord, trustee. The par value of said shares was one hundred dollars each. The market value in 1839 did not appear. The charter of the bank was granted in 1824, and expired in August, 1845. From 1839 to September, 1845, the bank divided three per cent. semi-annually; and those dividends were paid over by the trustee to Mrs. Brooks. Upon the back of the certificate is the following receipt: " Received of Piscataqua Bank four thousand dollars, being the par value of the within certificate. July 29th, 1845.
                                        " SAMUEL LORD."

Besides the above sum of four thousand dollars, Piscataqua Bank paid to the trustee the following dividends of surplus at the end of the charter :

| November, | 1845, | 15 | per cent., | $600.00 |
| April, | 1846, | 10 | per cent., | 400.00 |
| June, | 1847, | 3 | per cent., | 120.00 |
| August (final), | 1849, | 3.75 | "    " | 140.00 |
| | | | | $1,260.00 |

With the funds thus received from the Piscataqua Bank, the trustee purchased 53 shares in the Piscataqua Exchange Bank,—46 shares being purchased prior to April, 1846, and the remaining seven shares prior to April, 1850. The semi-annual dividend in March, 1846, was 3½ per cent. From that date to September, 1862, it was 3 per cent. In 1863 and 1864 it was 1½ per cent. These dividends were all paid over to Mrs. Brooks. The charter of the Piscataqua Exchange Bank was dated December, 1844, and expired August, 1865. Said bank ceased to do business in 1864; and, between November, 1864, and September, 1868, made various dividends of surplus, over and above the par value of the shares, which were received by the trustee, making not less than $8,029.50 in his hands, received on account of said 53 shares.

The trustee, who was cashier of both banks, testified that the sums divided as above (in excess of the par value) " were not on hand as cash in either of said banks when their charters expired, but

were subsequently collected out of obligations unmatured or suspended, and were divided at intervals as above named: a part of the interest was earned but unpaid when the charters expired, and part of it grew due afterwards; — a part of the sum divided as above by the Piscataqua Exchange Bank arose from the sale of their banking-house and fixtures." In 1864, the trustee invested four thousand dollars in the purchase of 40 shares in the First National Bank, Portsmouth, N. H. In November, 1864, he consulted a lawyer,—who was the son of a sister of Augustus Lord,—as to the proper disposition of the balance of $4,029.50 in his hands. In December, 1864, the lawyer gave his written opinion that Mrs. Brooks was entitled to receive the extra dividends as "income." Mr. Lord forwarded this opinion to Mrs. Brooks, and paid her one thousand dollars,—all or nearly all of which she distributed in presents to the children of the heirs of Augustus Lord, the descendants of the trustee receiving five hundred dollars. The balance of the surplus of $4,029.50 was placed by the trustee in his accounts to the credit of Mrs. Brooks, he informing her that he held it subject to her order. It remained thus until 1869, the trustee accounting to Mrs. Brooks semi-annually for interest on the balance, as well as the interest on the 40 shares of National Bank stock. In September, 1869, another lawyer, having been consulted by the trustee, gave his written opinion that the proceeds of the surplus bank dividends should be regarded as capital, belonging ultimately to the heirs of Augustus Lord. This opinion was sent to Mrs. Brooks by the trustee. The trustee thereupon invested three thousand dollars of the balance on hand in the purchase of bonds of the city of Portsmouth, Ohio, and has remaining, as he says, a cash balance of sixty-three dollars and fifteen cents ($63.15).

Mrs. Brooks died November 10, 1869. The trustee is the brother, and one of the heirs of Augustus Lord. The bill alleges that the heirs of Augustus demand of the trustee that he shall pay over to them the balance of $3,063.15, and also $2,294 alleged to have been overpaid to Mrs. Brooks. The administrator of Mrs. Brooks demands the whole of the balance, over and above the 40 shares in the First National Bank.

The trustee brings this bill in order to have the court determine who are entitled to the balance in his hands.

*W. H. Y. Hackett*, for Samuel Lord.

*W. H. Hackett*, for the other heirs of Augustus Lord.

*A. R. Hatch*, for Charles W. Brooks, administrator.

At the June term, 1871, the opinion of the court was announced as follows:

SMITH, J. We cannot agree with the plaintiff's counsel that the

deed is to be construed as if it had read " Mrs. Brooks is to receive
only what the directors may semi-annually divide as income." The
word " dividends," and the word " income," as used in this trust
deed, " both obviously mean the same thing." It was clearly the in-
tention that the tenant for life should, at the least, receive all the net
earnings thereafter accruing from the 40 shares which should be dis-
tributed to the shareholders during her life. As the only sums in con-
troversy were distributed as " dividends " *eo nomine*, it is unnecessary
to inquire whether the tenant for life would be entitled to earnings
which remained undivided ; and, as the dividends were all payable in
cash, we need not consider her right to dividends made payable in
stock. If it be conceded, for the purposes of this case, that the net
earnings of the bank remain the property of the bank as fully as its
other property till the directors declare a dividend, and that the tenant
for life has no title to them prior to the dividend being declared, still,
their nature remains the same all the time ; and when they are
divided, the tenant for life is just as much entitled to them as though
they had been divided the moment they were earned. Their source is
not changed by the delay in distribution. It may often be expedient
for the directors to retain a portion of the net earnings as a reserve
fund to meet contingencies. This reserve fund may often be spoken of
as " capital," irrespective of the source whence it is derived. But,
when the necessity for the reservation ceases, and the reserve fund is
divided among the shareholders, the question whether it is income or
capital depends on its origin. If it was originally taken from the net
earnings, it belongs to the tenant for life, if distributed in her lifetime.
If the tenant for life would have lost these surplus earnings by dying
before they were divided, that furnishes no cause for depriving her of
them when she had the good fortune to survive until the distribution.
We might as well deny her right to the regular semi-annual dividends
declared in her lifetime, on the ground that she could not have derived
any benefit from them in the event of her death immediately after the
creation of the trust. It has been said that " dividends of the assets
of a corporation *must* be capital." We fail to see why. If this posi-
tion is correct, then all dividends which are not made from borrowed
funds are capital, for they are dividends of the assets of the corpora-
tion, all net earnings being assets until they are divided.

The evidence does not show whether the entire dividends in dispute
were derived from profits earned subsequently to the creation of the
trust. Unless this is conceded, a master will be appointed to examine
and report the value of the 40 shares in the Piscataqua Bank, includ-
ing, of course, any accumulated profits previously earned and un-
divided at the date of the trust deed. Such accumulated profits are
to be considered as part of the capital of the trust fund then created.
If the payment of the extra dividends have impaired that capital, the
deficiency in the capital is to be restored by additions from the divi-
dends. The balance of the dividends belongs to the tenant for life.
As it seems to be conceded that the remainder-men are to receive the

40 shares in the First National Bank, the master will report the value of those shares at the death of the tenant for life. The court can then see whether those shares equal in value the original 40 shares at the creation of the trust; if so, nothing need be deducted from the dividends. We see no insuperable difficulty in the master's ascertaining these facts; nor any such difficulty as makes it expedient to adopt a different rule.

We do not think that the loss to which the remainder-men may be subjected, by the depreciation in the value of money during the life of the tenant, should induce us to put a forced construction on the plain and explicit language of the trust deed. It is a risk which they have to run, just as much as the tenant had to run the risk of losing the income by premature death.

The view we have taken seems to be sustained by decisions in Pennsylvania, New York, and New Jersey. *Carp's Case*, 28 Penn. St. 368; *Clarkson* v. *Clarkson*, 18 Barb. 646; *Simpson* v. *Moore*, 30 Barb. 637; *Van Doren* v. *Olden*, 4 C. E. Green 176. The earlier English decisions do not appear to be now regarded as law in that country. The recent decisions in Massachusetts—*Minot* v. *Paine*, 99 Mass. 101; *Daland* v. *Williams*, 101 Mass. 571; *Leland* v. *Hayden*, 102 Mass. 542—are not in point. The reasoning in *Minot* v. *Paine* is unsatisfactory to us. We have examined the later English decisions, but find no reasoning which induces us to come to a different conclusion from that just expressed.

*Winslow* v. *Haven*, decided in Rockingham county, December term, 1866, is not necessarily in conflict with these views. That was an equity suit, heard upon the bill and answer. Upon such hearing the allegations of the answer were, of course, taken to be true. *Rogers* v. *Mitchell*, 41 N. H. 154. The controversy related to the right of the tenant for life (of the " income ") to receive dividends made by certain State banks in Massachusetts at the time of their reorganization as National banks. The answer alleged that the State banks were, by the law of Massachusetts, required to keep constantly in their vaults a specie reserve; that such reserve fund " was a part and parcel of the capital stock, and no part of the profits or income of each and every of said banks; " and the answer then averred, in substance, that the dividends in controversy were made chiefly from the sale of said specie reserves, and were " in reality a portion of the capital of said banks." No opinion has been reported; but, from memoranda furnished us by the then members of the court, it is quite apparent that the decision in favor of the remainder-men proceeded entirely on the ground that, upon the bill and answer, the court must regard these dividends as made, not from accumulated profits, but from capital. In the present case the tenant for life is not so unfortunate as to be concluded by the pleadings on this point. On the contrary, the source of the dividends is an open question, to be found and determined by the master.

If *Winslow* v. *Haven* were more nearly in point, we might not feel bound to follow an unreported decision, especially as the important

authorities in Pennsylvania and New York do not seem to have been brought to the attention of the court (the New Jersey decision was made subsequently).

In *Wheeler* v. *Perry*, 18 N. H. 307, there was no suggestion that the dividends in dispute were derived from earnings which had accrued since the death of the testator. On the contrary, it appeared that the value of the stock had increased largely in the lifetime of the testator; that this increase was regarded by the testator as an increase of the capital; and that the dividends in controversy were made from the sale of the property which had thus increased in value: in effect, being dividends of a fund which the testator in making his will treated as capital,—a fund in existence in another shape at the date of the will, and not earned since the testator's death.

*Healey* v. *Toppan*, 45 N. H. 243, cited by the plaintiff, is not in point. The shares in the Piscataqua Bank were not " perishable property," or " wasting securities."

*Master appointed.*

The master subsequently reported that the value of the 40 shares in the Piscataqua Bank, at the date of the trust deed (including accumulated profits previously earned and then undivided), was less than the value of the 40 shares in the First National Bank at the death of the tenant for life.

The plaintiff moved for a rehearing of the questions decided in the opinion delivered at the June term, 1871. After such rehearing, the following opinion of the court was announced at the June term, 1872 :

LADD, J. An opinion was delivered by Judge SMITH in this case at the June term, 1871, in which we all, at that time, concurred,—holding, in substance, that the fund in controversy should go to the executor of Mrs. Brooks, the tenant for life. The plaintiff now moves for a rehearing, principally upon the ground, as we understand his argument, that the court misconceived the facts when the case was decided before. Counsel have also entered into an elaborate discussion of the law applicable to the case, criticising with some vigor the positions assumed by Judge SMITH.

We are quite sensible that, in the multiplicity and variety of matters which this court is called upon to consider and decide, mistakes are likely to be made in spite of the best diligence we can use, even when aided, as we have been in this case, by the labors of vigilant and able counsel. And when such mistakes can be discovered before the matter in hand is finally disposed of, it must always be the pleasure, as it is the duty, of the court to retrace its steps. We have, therefore, carefully reëxamined our former opinion, as well as the evidence laid before us, and the law involved in the decision of this case, in order to discover and correct, if possible, any errors that may have been committed.

It is said that the court misconceived the facts in this,—that the fund

in dispute was not distributed *eo nomine* as dividends, but, on the contrary, that it was distributed at the end of the charter as and with capital ; that " no part of said $3,063.15 was ever paid or treated as dividend or income, but always as capital ;"—and again, the question is stated to be " whether the surplus—*not divided as extra dividends during the charter*, but held and distributed as and with the capital at the end of the charter—was ' dividend or income ' within the meaning of the trust, or whether it is capital."

Before we examine the evidence to see whether a mistake was made in finding therefrom that the surplus was paid out as dividends *eo nomine*, there are two or three preliminary matters which it will be useful to consider.

First, as to the instrument creating the trust : the words therein used, upon which the rights of these parties depend, are " income or profits " to Mrs. Brooks, and " shares " to the heirs-at-law. No other words, by way of definition, amplification, or construction, can make these terms plainer ; it is impossible that they should be misunderstood as they stand in the paper. The provision is unequivocal and unmistakable, that, during the continuance of the trust, whatever arises out of the shares as income or dividends belongs to Mrs. Brooks, and, upon the termination of the trust, whatever then constitutes the shares goes to the remainder-men ; and whether the shares have been legally made larger or smaller during the time, makes no difference,—for it is the *shares*, and nothing more nor less, that the heirs take under the trust. The paper, therefore, needs and admits of no further or different construction.

A second matter to be considered here is the legal question suggested by an observation found on page 7 of the plaintiff's last printed brief. He says, " ' Dividend or income,' as used in this trust, are convertible terms, and are technical, and mean what the directors semi-annually divide as profit." This, of course, means that any extra dividend, or bonus as it is sometimes called, made by the directors, would be a division of so much capital, although the money divided was in fact earnings and income ; in other words, a distribution of so large an integral portion of the shares themselves. Such a doctrine finds countenance in the early case of *Brander* v. *Brander*, 4 Ves. 800, decided in 1799, and the three or four English cases in which that case was followed, namely,—*Irvine* v. *Houston*, in the house of lords, upon appeal from the court of sessions in Scotland in 1802 ; *Paris* v. *Paris*, 10 Ves. 185 ; *Clayton* v. *Gresham*, 10 Ves. 288 ; *Witts* v. *Steere*, 13 Ves. 366, decided in February, 1807 ; although I am unable to find that anybody ever regarded the doctrine of *Brander* v. *Brander* as good law. See remarks of the CHANCELLOR and counsel in all the other cases above cited. And in *Barclay* v. *Wainewright*, decided in 1807, a different doctrine was laid down by Lord ELDON ; and we have not found any case since that time, either English or American, where it is held that an extra dividend or bonus made out of the earnings or profits of the corporation and distributed in cash goes to the remainder-man, as

an accretion to the stock ; while the cases the other way are numerous. See *Barclay* v. *Wainewright, sup. ; Norris* v. *Harrison,* 2 Mad. 279 ; *Hooper* v. *Rossiter,* McClel. 527 ; *Price* v. *Anderson,* 15 Sim. 473 ; *Bates* v. *Mackinley,* 31 Beav. 280 ; *Johnson* v. *Johnson,* 5 Eng. L. & Eq. 164 ; *Murray* v. *Glasse,* 15 Jur. 816 ; *Cuming* v. *Boswell,* 2 Jur. (N. S.) 1005 ; *Clive* v. *Clive,* Kay 600 ; *Plumbe* v. *Neild,* 6 Jur: (N. S.) 529 ; *Wright* v. *Tucket,* 1 John. & Hem. 266 ; *Cogswell* v. *Cogswell,* 2 Edw. Ch. 231 ; *Ware* v. *M' Candlish,* 11 Leigh. 595 ; *Harvard College* v. *Amory,* 9 Pick. 446 ; *Daland* v. *Williams,* 101 Mass. 571 ; *Leland* v. *Hayden,* 102 Mass. 542 ; *Earp's Appeal,* 28 Penn. St. 368 ; *Clarkson* v. *Clarkson,* 18 Barb. 646 ; *Simpson* v. *Moore,* 30 Barb. 638 ; *Van Doren* v. *Olden,* 19 N. J. 117 ; *in re Barton's Trust,* L. R. 5 Eq. 238.

It is true these cases differ widely upon some points, but they will all be found more or less distinctly to recognize or enunciate the doctrine that any dividend in cash of the income or profits of a corporation among the shareholders goes to the tenant for life ; and that it makes no difference whether such dividend be declared as a regular dividend, or an extra dividend or bonus ; and none of them are the other way.

Mr. Perry, in his late valuable work on Trusts, has collected most of these cases, and comments on some of them at length in notes. As a conclusion from the examination made by him, he says (p. 485) the early English rule, that all extra cash dividends or *bonuses* went to the remainder-man, has been so far modified, that dividends in money which come from the earnings of the capital invested belong to the tenant for life. And thus far the cases are undoubtedly agreed.

We shall find before we are through that the application of this doctrine, now universally accepted as correct, has an important bearing upon the present case.

It is claimed that this surplus was capital " because the State laws recognized and taxed it as capital." The whole of the section to which we are referred in support of this is as follows : " The surplus capital on hand in banking institutions in this State shall be taxed in the towns wherein such banking institutions are located ; stock in banks, insurance, and other corporations, except railroads and manufacturing corporations, in this State, shall be taxed to the owner thereof in the town in which he resides, if in this State, otherwise to the corporation in the town in which its principal office or place of business in the State shall be kept." Comp. Stats., p. 115, sec. 4.

It is not easy to see how it can be inferred from this that the legislature regarded surplus capital as the same thing with stock ; they are certainly spoken of as two distinct and different things, to be taxed in different places.

If any weight, therefore, is to be given to legislative construction, as shown by the law in question, it is entirely against the idea that surplus capital and capital stock are the same. The difference is broad and impassable. One is the property of the bank until it is divided or otherwise appropriated for the benefit of the stockholders ; the other is the individual property of the stockholders. Therefore one was rightly

taxed to the bank in the town where it was situated, while the other was rightly taxed to the individual owner in the town where he lived.

If any further proof were wanted that the legislature have not considered accumulated earnings the same thing as capital stock, it is furnished in section 14 of chapter 148, Compiled Statutes, where it is said,—"The capital stock of all banking corporations in this State shall be taken and held to be the amount of capital actually paid in in cash." And see, also, the three sections following.

It is said that " In banks there are three accounts, under the head of one of which all the interest accruing or accrued is entered,—namely, surplus, profit and loss, and interest ; and the nature of each of these accounts is explained. It is further said that extra dividends may be made, and are made, from the profit and loss account, but not from the surplus account ; that such dividends cannot be made from that account because it is capital. There is no evidence in the case showing how the business of banks in this respect is carried on. But, from the statement of counsel, it appears that the same thing, in substance, makes up the body of each account,—namely, interest or earnings of the shares. All this amounts to, then, if we come to the substance of the thing, is, that, for convenience and system in managing their affairs, banks distribute or marshal the interest accruing and accrued,—that is, the earnings of the shares,—under three heads. But I cannot conceive why placing it under one head or in one account should make one thing of it, while placing it under another head or in another account makes it another and different thing. The plaintiff says that in the cases where extra dividends have been held to be income for the life tenant, those dividends were taken from the profit and loss account. A careful examination of the cases already cited does not show that any such distinction was taken or alluded to in either of them. Whether the corporations in those cases had the three accounts here mentioned does not appear. It simply appears that they were dividends of accumulated earnings or surplus profits ; and we are quite agreed that a distribution of earnings on hand, and not before divided, must be governed by the same rule without reference to the particular account under which it may have been kept by the bank in the management of their business.

We may now return to the inquiry, whether the court misconceived the facts in finding that the fund in dispute was distributed *eo nomine* as dividends.

The separate facts in relation to this point are entirely plain, and easy to be understood. The evidence shows distinctly what was done, from first to last, by all the parties interested, or who have had anything to do with the trust fund ; and there is no dispute. The claim is, not that the court misunderstood, or that Judge SMITH misstated any single isolated fact, but that, from the undisputed facts disclosed, the court ought to have found that the surplus divided upon winding up the affairs of the Piscataqua Bank in 1845 and afterwards, and the surplus divided on winding up the affairs of the Piscataqua Exchange

Bank in 1864 and afterwards, was capital; in other words, that the money so distributed had, before that time, been so fused into the shares as to be made an integral part of them, so that by the terms of the deed it would go to the remainder-men as shares.

In support of this view, it is said that it is the custom and practice of all sound banking institutions to reserve and set aside a portion of the earnings of the stock, to be held by the bank and used as active capital; that this is not only the dictate of prudence, but is required by law (by which we understand is meant a by-law or vote of the bank, and not the law of the State); that, by declaring and paying dividends which should absorb the whole income or earnings, the institution would be so weakened, that in emergencies, caused by financial revulsions or otherwise, the safety of the fund itself represented by the stock would be endangered; that this being so, and this course having been pursued in reference to the forty shares in question here, the surplus thus reserved by the two banks for this purpose actually became capital stock, and so entered into and formed a substantive part of the shares. And it is said that the error in the decision of this case would have been avoided if the court had recognized the action of the bank as conclusive upon the question, what was income and what capital.

The conclusion then, as I understand it, that the court misconceived the facts, is drawn, not so much from the evidence laid before us, as from the legal results which it is claimed follow from that evidence. For example, we have been furnished with no evidence of any kind that a rule of the bank existed, such as is spoken of in the argument, whereby it was provided that such portion of the earnings or income as was not divided should thereupon become capital stock. We have no evidence that these banks, by keeping a separate account of surplus, which we are told means addition to capital, regarded or treated such surplus or addition to capital as an integral part and parcel of the shares of their stock.

There is no evidence of any act of the banks or their directors, except the retention of part of the earnings of the shares, to indicate a purpose to transmute into shares what was before income, admitting that they had such power. But the naked proposition is this: when it appears, as it does in this case, that the directors or the banks reserved,—that is, omitted to divide,—a portion of the income, the court are to say, as matter of law, that the portion thus reserved thereupon, immediately and by force of the reservation, is changed into shares. Whether income has been converted into shares is clearly a question of fact. But whether the act of reserving it,—that is, omitting to divide and pay it out to the share-owners,—works such transformation, involves a question of law. The term "surplus capital" is used in the argument; but by this, of course, is meant capital stock or shares, for what the deed calls for in favor of the remainder-men is shares; and upon any other interpretation the argument loses all force and relevancy. We can easily avoid confusion by bearing this in mind.

The question of law thus presented is, Has a banking corporation the legal power, acting in good faith, to capitalize its earnings without applying them to improve or enlarge its corporate property? This question I propose to waive for the present by admitting, for the sake of the argument, that it has such power.

The question of fact is, Did the banks in this case do such act or acts, with reference to the fund in dispute, as transmuted it from income to shares? Their only act, which is shown by the evidence, was reserving it. If, however, we admit the statement of counsel, they reserved it and placed it in the " surplus " account.

Let it also be admitted that this act had the effect claimed for it,— that is, that it made shares of what was before income.

The case, then, stands thus: during all the time this reserved surplus was in the hands of the banks it was part and parcel of the forty shares which had earned it; so welded to those shares, if we may use the expression, that the two had become one piece. What follows?

We have already seen that extra dividends in cash, made from accumulated earnings or income,—that is, from earnings which have not been divided,—in other words, from earnings which have been reserved,— upon the authority of all the cases for the last sixty-five years, leave the hands of the corporation not shares or aliquot parts of shares, but income, and go, not to the fund, but to the *cestui que trust.* Now, admitting what has already been admitted, that the act of reserving or retaining converts income into shares, it follows that dividing and paying it out changes it back into income again; so that, after two transmutations, it comes out of the crucible the same thing it went in,—namely, income.

If, then, the sum in dispute here was paid out as dividends and not withdrawn as shares, it would seem to follow that the act of the banks restored its original character of income, although their previous act of reserving had before converted it into shares.

The plaintiff says it was distributed as and with capital. To ascertain how the fact was, we must refer to the evidence; and the only evidence in the case bearing upon the point is the testimony of the trustee, Mr. Lord, who was cashier of both banks, and the orignal certificate of stock in the Piscataqua Bank issued to him at the time he accepted the trust.

That certificate bears upon its back a receipt, signed by Mr. Lord, and in his handwriting, in these words: " Received of Piscataqua bank four thousand dollars, being the par value of the within certificate. July 29, 1845." The names of the president and cashier are cut out of it, and no evidence has been introduced tending to show that anything more was ever paid in any form by the bank to cancel the certificate. From this evidence alone, unexplained and uncontradicted as it is, I think we should be compelled to find that $4,000, the par value of the shares, was all that was ever distributed *as shares* by the Piscataqua Bank to this trustee. But Mr. Lord, in his deposition, says,—" Piscataqua Bank paid the following *dividends* of surplus at

the end of the charter,"— giving the dates and amounts of the dividends.

The original certificate of stock in the Piscataqua Exchange Bank is not before us, but the evidence shows that the business was done in the same way. The stock, at its par value, was paid off, and afterwards, as Mr. Lord says, the bank made *dividends* of surplus, the dates and amounts being given as before.

We need not remark that it is quite apparent from Mr. Lord's deposition, the answers being in his own handwriting, that he was a careful, accurate business man, of large experience, and at least ordinary intelligence; a man who, it is safe to presume, knew the force and significance of the language he used in relation to the business of banks and banking. When, therefore, he tell us that this money was paid out by those banks as dividends—and there is no evidence the other way—we are quite at a loss to know upon what ground we are to find that it was distributed as shares; and we therefore find ourselves unable to go with the learned counsel for the plaintiff in saying that no part of said $3,063.15 was ever paid or treated as " dividend or income"—*dividend* and *income* being convertible terms.

Mr. Hackett says it was distributed as capital, by which, of course, must be meant capital stock or shares, and that if the court had recognized the action of the banks as conclusive, the error would have been avoided.

We have considered the evidence carefully, and think it shows exactly the contrary to be true, in two distinct ways: first, it shows clearly, we think, that neither of the banks paid out anything beyond the $4,000 as shares or capital stock ; and second, it shows clearly that all the rest was, in fact, paid as dividends. So that, if the court regard the action of the banks as conclusive, the result reached must be just the opposite of that supposed.

But some stress seems to be laid in the argument upon the fact that these dividends were made out of a surplus on hand at the winding up of the affairs of the banks, and at the expiration of their charters. It is said, for example, that there is a wide difference between an extra dividend in cash or stock, made by a bank in operation under its charter, and surplus capital on hand at the end of a charter ; and further, " it is believed that in modern times and in this country no respectable court, except this, has held that the surplus of a bank on hand at the expiration of the charter, and held in obedience to law to protect its stock, was not capital but income," &c.

It would hardly seem necessary to argue that a fund held to protect stock must be a different thing from the stock which receives its protection. The language employed certainly implies that the fund was not an integral part of the shares, but a different thing, held separate from them, to protect their integrity. And when it is remembered that forty shares of stock is what the remainder-men take by the deed, it is manifest that the terms thus employed to designate the office of the surplus while in the banks show that it is not within the description

of their right. But waiving this, the inquiry is, whether a distribution of surplus in extra dividends at the expiration of the charter of a bank stands on a different footing from a distribution of surplus in extra dividends made while the bank is in operation, and before the charter expires. The plaintiff says there is a wide difference; and the reason he gives is, that "extra dividends, either in cash or stock, are taken from the profit and loss account, and are made because the surplus which remains untouched is sufficient to protect the capital. The surplus cannot be divided, because it is a part of the capital. The profit and loss account may be diminished by extra dividends, because it is profit." This clearly does not meet the inquiry at all. It is an assertion that extra dividends cannot be made out of surplus at any time,—no more while the bank is in operation than after it has suspended active business,—first, because surplus is *held to protect capital*, and secondly, because *surplus is capital.* This gives us no aid. It is a position which, if sustained, goes to the whole case, and has already been sufficiently alluded to; but it clearly has no bearing upon the point under consideration, whether a dividend of surplus made after the expiration of the charter stands differently from one made during the existence of the charter; and since no other reason is suggested, by the very able counsel in this case, why the power of the directors and the effect of their act in distributing this fund was not the same when done in the process of winding up the affairs of the banks that it would have been at any previous time, it is probably safe enough to.assume that there is no reason. We have been referred to no authorties for such a position, and no reason in support of it occurs to us, notwithstanding the somewhat forcible terms in which it has been laid down.

It will be observed that the argument has proceeded thus far upon the plaintiff's theory that banks have the legal power to convert income into capital stock or shares at their pleasure, by reserving it as surplus and entering it upon their surplus account, supplemented by the undisputed law, that if they afterwards distribute and pay it out as dividends, they thereby restore its original character of income.

Finding, as we do, from the evidence, that both banks did distribute this fund as dividends in the lifetime of Mr. Brooks, the result is that it left their hands income, whatever character they may have imposed upon it while they held it, and it therefore goes by the express terms of the deed to the tenant for life.

It must not be supposed that we adopt the views of law or fact which have been admitted only for the purpose of this discussion.

If banking corporations have not the legal power to convert income into capital by any act, or if, having such power, the mere act of reserving it is not sufficient to effect such change, it would follow that it makes no difference how or when this surplus was finally distributed. If it was income in the beginning, and either the banks had not the legal power to change its essential character so as to make it stock, or, having such power, did not exercise it, it would be income still, and all the time; and no matter in what form it was paid, or when, if,

during the continuance of the trust, it would confessedly go to the tenant for life.

With the question of fact here involved we should probably have little trouble, were it necessary to pass upon it. Whether corporations have the legal power by any act to capitalize their earnings so as to divert income from the life tenant to the remainder-man, and, if so, whether this power exists in all corporations and under all circumstances, is, perhaps, a question of more difficulty; at any rate, it is one we are not now called upon to decide.

There are undoubtedly authorities of the highest respectability and weight to the effect that some corporations may, for some purposes, convert their earnings into capital so as to divert them from the *cestui que trust* to the fund. For example: if a railroad corporation uses its earnings to erect buildings, or in the purchase of wharves, grain elevators and the like, necessary or convenient for the prosecution of its business, thus enlarging and improving its property, and issues new certificates of stock, or, in any other form, places in the hands of its stockholders evidence of their interest in the addition thus made by an appropriation of income to the absolute property or capital of the corporation,—there are cases which hold that such addition to the actual capital thereby loses its original character of income, and that the evidence of its ownership belongs to the trustee. *Leland* v. *Hayden*, 102 Mass. 550; *in re Barton's Trust*, Law Rep., 5 Eq. 238; Perry on Trusts 488, note.

A distinction is perhaps made between a case like the present, where a bank or other moneyed institution merely reserves a portion of its earnings as a surplus fund to guard against contingencies, to protect the principal, to fortify its credit and facilitate its operations, doing no other act to blend the income thus retained with, and make it part of the capital stock, and a case where the earnings are legally and in good faith appropriated and applied by the corporation, to enlarge or improve its corporate property, and are thus, as it were, fused into the capital stock.

The position is, that the interest of the *cestui que trust* in the stock of such a corporation, under such circumstances, must be considered as held subject to such right of appropriation in the corporation,—his right to receive the whole income being upon the condition that no part of it be thus applied.

Of this, however, the court express no opinion, and are not, by these observations, committed at all to such a view. We are all satisfied, upon a full and careful reëxamination of the case, that it was rightly decided upon the ground already stated,—that the fund in controversy was divided and paid out as dividends *eo nomine* in the lifetime of Mrs. Brooks, and that being so, by the express terms of the deed of trust she was entitled to it.

We see no error in the mode adopted by the master in arriving at the valuation of the shares; and a decree must be entered in accordance with the views expressed in the former opinion.